1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES SILVERTHORN, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>LUMBER LIQUIDATORS, INC., et al.,<br><br>        Defendants. | Case Nos.  15-cv-01428-JST, 15-cv-01475-JST<br><br>**ORDER STAYING MOTIONS FOR PRELIMINARY INJUNCTION, MOTION FOR PROTECTIVE ORDER, MOTION FOR EXPEDITED DISCOVERY** |
| LILA WASHINGTON, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>LUMBER LIQUIDATORS, INC.,<br><br>        Defendant. | |
| AND RELATED CASES. | |

These cases are two of the 20 related cases currently pending in this District concerning allegations that Defendant Lumber Liquidators' laminate wood flooring products contain dangerous levels of formaldehyde. [1]   In the wake of these allegations, Defendant has begun offering "free do-it-yourself air testing kits upon request to customers whose records confirm that they bought certain flooring products" from Defendant.  ECF No. 11.

_____

[1] Dozens of other cases involving similar allegations have been filed across the country.  The Plaintiffs in related case Conte v. Lumber Liquidators, Inc. et al., No. 15-cv-01012-JST, have filed a motion before the Judicial Panel on Multidistrict Litigation (JPML) pursuant to 28 U.S.C. § 1407, requesting the consolidation and transfer of all of these cases for pretrial proceedings. See In Re: Lumber Liquidators Chinese-Manufactured Flooring Products Marketing, Sales Practices and Products Liability Litigation, MDL No. 2627, ECF No. 1 (J.P.M.L. Mar. 9, 2015). The J.P.M.L. will hear argument on the motion on May 28.

Now before the Court are two challenges to Defendant's air testing kit program.  Plaintiffs in Washington v. Lumber Liquidators, Inc., No. 15-cv- 01475-JST ("Washington Plaintiffs"), have filed a motion for preliminary injunction, seeking to enjoin Defendant from continuing to represent that its air testing kits are an effective method of detecting the level of formaldehyde and requiring Defendant to advise inquiring customers to retain "a qualified industrial hygienist, environmental scientist, or toxicologist to perform proper testing."  Washington at ECF No. 11.  Plaintiffs in related case Silverthorn v. Lumber Liquidators, Inc., No. 15-cv-01428-JST ("Silverthorn Plaintiffs"), have filed a motion asking the Court to grant expedited discovery relating to the air testing program and to enter a provisional protective order to prevent prejudice to potential class members that might result from Defendant's communications in connection with the home air testing kit.  Silverthorn at ECF No. 19.  These motions came for a hearing on May 14, 2015.

## I.    BACKGROUND

### A.    Procedural History

On March 1, 2015, the television news program 60 Minutes aired a segment claiming that Defendant's products were in violation of "California Air Resources Board (CARB) certifications related to formaldehyde emissions from laminate flooring."  Declaration of Elizabeth Black ("Black Decl."), Washington at ECF No. 12 at ¶ 2; Declaration of Brian Pullin ("Pullin Decl."), Silverthorn at ECF No. 38, ¶ 2.  The first of these related actions, Balero v. Lumber Liquidators, Inc., 15-cv-01005-JST, was filed days later on March 4, 2015.  There are presently 20 related cases in this District.  Dozens of other cases involving similar allegations have been filed across the country.

The Plaintiffs in related case Conte v. Lumber Liquidators, Inc. et al., No. 15-cv-01012-JST, have filed a motion before the Judicial Panel on Multidistrict Litigation (JPML) pursuant to 28 U.S.C. § 1407, requesting the consolidation and transfer of all of these cases for pretrial proceedings.  See In Re: Lumber Liquidators Chinese-Manufactured Flooring Products Marketing, Sales Practices and Products Liability Litigation, MDL No. 2627, ECF No. 1 (J.P.M.L. Mar. 9, 2015).  The JPML will hear argument on the motion on May 28, 2015.

2

United States District Court
Northern District of California

1        Due to the pendency of the JPML proceedings, Defendant filed a motion to stay all court

2   deadlines in <u>Balero</u> and related cases until the JPML decides the transfer motion.  <u>Balero</u> at ECF

3   No. 26.  On April 1, the Court concluded that "a complete stay of all pretrial proceedings would

4   not promote judicial economy," and "retain[ed] the flexibility to stay only those matters that

5   should await resolution of the JPML proceeding, while allowing other matters to move forward."

6   <u>Balero</u> at ECF No. 32.   The Court accordingly stayed the motion to dismiss Defendant had filed

7   in <u>Balero</u>, but declined to stay other matters at that time.  <u>Id.</u>

8        On April 4, the <u>Silverthorn</u> Plaintiffs filed an emergency motion for a protective order.

9   <u>Silverthorn</u> at ECF No. 19.  On April 8, the <u>Washington</u> Plaintiffs filed a motion for preliminary

10   injunction.  <u>Washington</u> at ECF No. 11.  Both motions contended that the Court should take some

11   form of action to oversee Defendant's home air testing kit program, which the <u>Silverthorn</u> and

12   <u>Washington</u> Plaintiffs alleged was actively disseminating false or misleading information to

13   consumers.

14        Defendant moved to stay these motions during the pendency of the JPML.  <u>Washington</u> at

15   ECF No. 18; <u>Silverthorn</u> at ECF No. 29.  The Court denied Defendant's motions, noting that

16   "[t]he pendency of a motion, order to show cause, conditional transfer order or conditional remand

17   order before the Panel pursuant to 28 U.S.C. § 1407 does not affect or suspend orders and pretrial

18   proceedings in any pending federal district court action and does not limit the pretrial jurisdiction

19   of that court."  <u>Silverthorn</u> at ECF No. 29 (quoting Judicial Panel on Multidistrict Litigation, Rule

20   2.1).  Nonetheless, the Court acknowledged that it "may ultimately conclude that it should deny or

21   defer the relief Plaintiff seeks, either because the relief is not justified on the merits, or because the

22   interests of consistency, uniformity, and efficient case management would be better served by

23   allowing the MDL transferee court to rule on Plaintiff's motion."  <u>Id.</u>

24        The <u>Washington</u> Plaintiffs subsequently filed a motion to expedite limited discovery,

25   <u>Washington</u> at ECF No. 37, requesting to take depositions of two individuals who had submitted

26   declarations in support of Defendant's opposition to Plaintiffs' motion for a preliminary

27   injunction.  The Court granted the request.  ECF No. 58.

28   / / /

**B.      Defendant's Air Test Kit Program**

Defendant initiated the air test kit program in response to customer concerns that arose in the wake of the 60 Minutes report.  Pullin Decl., <u>Washington</u> at ECF No. 25, ¶ 3.  Customers can receive a home test kit by either calling a 1-800 number or filling out an online form at http://www.lumberliquidators.com/safety.  <u>Id.</u> at ¶ 5.  As of April 21, 2015, 24,915 air test kits had been sent to Defendant's customers.   Id. at ¶ 6.

Customers who sign up to receive an air test kit using Defendant's website are required to fill out a form on that site.  ECF No. 19 at 6.  The website's "Terms and Conditions" state:

> You agree that this agreement and your use of this Site are governed by the laws of the State of Virginia, USA. You hereby consent to the exclusive jurisdiction and venue of the courts, tribunals, agencies and other dispute resolution organizations in Richmond, Virginia, USA in all disputes (a) arising out of, relating to, or concerning this Site and/or this agreement, (b) in which this Site and/or this agreement is an issue or a material fact, or (c) in which this Site and/or this agreement is referenced in a paper filed in a court, tribunal, agency or other dispute resolution organization . . . .

> With the prior agreement of Lumber Liquidators, any claim, dispute or controversy arising out of, relating to or concerning this Site and/or this agreement shall be decided by binding arbitration in accordance with the Rules of the American Arbitration Association and any such arbitration proceedings shall be brought and held in Richmond, Virginia, USA. The decisions of the arbitrators shall be binding and conclusive upon all parties involved and judgment upon any award of the arbitrators may be entered by any court having competent jurisdiction. This provision shall be specifically enforceable in any court of competent jurisdiction.

<u>Silverthorn</u> at ECF No. 19-1, 76-77.

Defendant's air test kit program uses "passive dosimeters which are sent from a central laboratory to untrained lay people for deployment and collection using written instructions for guidance," a technique that Defendant contends "has been utilized in multiple peer reviewed studies, with success, for decades to evaluate indoor environments."  Declaration of John F. McCarthy, <u>Washington</u> at ECF No. 27, ¶ 6.  Because Defendant's "protocol is designed to collect total airborne formaldehyde levels found in the indoor environment of the room being tested . . . it will measure formaldehyde in air that can come from multiple other sources within the home environment such as cooking, smoking, furniture, cabinetry, drapery and the outdoors."  <u>Id.</u> at ¶ 8.  Defendant has submitted a declaration by John F. McCarthy, President of Environmental Health and Engineering, stating that under this test design, there is "a high probability that sample results

1   will overestimate the concentration of formaldehyde that is in the room where the test is being

2   taken that could be potentially attributed to the subject flooring."  Id.

3        The Washington Plaintiffs have submitted the declaration of Certified Industrial Hygienist

4   Elizabeth Black, who disputes the reliability of the results of the air testing program.  Declaration

5   of Elizabeth Black ("Black Decl."), Washington at ECF No. 12.  Black states that it is "unlikely

6   that a user will be able to collect a valid and useful sample using this oversimplified test protocol."

7   Id.  Black contends that the air test kit program "is misleading in that it is usually quite difficult to

8   collect a scientifically valid sample that accurately measures the true degree of risk related to the

9   presence of formaldehyde containing flooring in the home" and "[h]azard assessment is not a one-

10  size-fits-all procedure."  Id. at ¶¶ 12-13.  Because the air testing program as administered by

11  customers in their own homes does not account for a variety of factors that might affect the

12  sample, Black contends that the kit "falls short of collecting a scientifically valid sample."  Id. at ¶

13  14.

14       Defendant notifies customers of their test results by email, or postal mail if no email

15  address has been provided.  Pullin Decl., Washington at ECF No. 25, ¶ 8.  Defendant's Director of

16  Customer Care and Telesales, Brian Pullin, states that Defendant sends one of three letters to

17  customers depending on the formaldehyde levels measured in their test results.  Id. at ¶ 10.  All of

18  the letters sent to customers reflect Defendant's position that "normal formaldehyde levels for

19  indoor air range from 0.020 to 0.100 parts per million [ppm]."  Washington at ECF Nos. 25-1, 25-

20  2, 25-3.  Defendant cites "the U.S. Environmental Protection Agency's recent study of

21  formaldehyde" in support of this proposition.  Id.

22       Pullin states that "[i]f a customer's test results return with elevated levels (above 0.080

23  parts per million), they will receive a letter and an affirmative phone call from a customer service

24  representative who will administer the test validation form (i.e., a survey)."  Pullin Decl.,

25  Washington at ECF No. 25, ¶ 11.  If customers have a level above 0.080 ppm or continuing

26  concerns, Pullin states that they will be contacted by a representative for Defendant "with plans to

27  analyze a sample of their laminate flooring to assess what further action, if any, may be

28  warranted."  Id. at ¶ 12.

United States District Court
Northern District of California

5

Plaintiffs dispute that the air levels below 0.080 ppm are in fact safe. Black states that "it is misleading to tell people whose formaldehyde levels fall within the range of 0.02 to 0.10 ppm that their formaldehyde levels are within a 'normal' range and suggest that they not take further action." <u>Washington</u> at ECF No. 34, ¶ 5. Black contends that 0.080 ppm is "40 times the recommended level for chronic exposure – which is the applicable level in a home environment." <u>Id.</u> Therefore, Black concludes that Defendant's "test and the report that transmits it will, in at least some cases, expose people to additional risk due to unsafe levels of formaldehyde." <u>Id.</u> at ¶ 6. The <u>Washington</u> Plaintiffs also observe that "[t]he study cited in the letters is, in fact, nothing more than a draft EPA study from 2010, which, as the EPA has clearly stated on every page of the study, 'does not constitute Agency policy' and for which the EPA has directed (again on every page): 'DRAFT - DO NOT CITE OR QUOTE.'" <u>Washington</u> at ECF No. 32, 5.

## II.    RELIEF SOUGHT

The <u>Washington</u> Plaintiffs assert that Defendant's kits "do not comply with accepted industry standards, are inherently unreliable, and are likely to under-report the amount of formaldehyde present" in tested products, which may cause affected individuals "to delay or forego the remedial measures they need to take immediately" to remove their dangerous flooring. ECF No. 11 at 1-2. The <u>Washington</u> Plaintiffs also contend that Defendant's home testing kits and associated correspondence "will falsely lead some [putative class members] to believe that their floors are safe." <u>Id.</u> The <u>Washington</u> Plaintiffs ask the Court to issue a preliminary injunction prohibiting Defendant "from representing that home air testing kits are an effective method of detecting the level of formaldehyde in their customers' homes" and requiring Defendant "to advise inquiring customers to retain a qualified industrial hygienist, environmental scientist, or toxicologist to perform proper testing." ECF No. 11-1 at 1.

The <u>Silverthorn</u> Plaintiffs seek an order requiring Defendant to "prominently notify class members who request or process air testing kits via the website of the pending litigation and contact information for plaintiff's counsel" and prohibiting Defendant from "soliciting or negotiating any releases or waivers without first notifying customers of the pending litigation and of the contact information of class counsel." ECF No. 19. The <u>Silverthorn</u> Plaintiffs' have

United States District Court
Northern District of California

1    proposed a provisional protective order that would state:[2]

2         Defendant Lumber Liquidators, Inc. ("Lumber Liquidators") is hereby
3    directed, within ten (10) days of entry of this Order, to do or refrain from doing the
     following, and to direct its subsidiaries or affiliates that it controls to do or refrain
     from doing the following in connection with its home air test program, aka
4    Formaldehyde Screening Check FOSC):

5         Website contacts with class members.  For Lumber Liquidators customers
     who (i) click the button on Lumber Liquidators' website page under the heading
6    "Air Quality Test Kit" that is labeled "Does my floor qualify," and are directed to
     or otherwise browse to the page www.lumberliquidators.com/ll/testkit: (ii)
7    indicates [sic] on that page that they have a "laminate" floor installed; and (iii)
     complete the form and are qualified to receive a FOSC provided or paid for by
8    Lumber Liquidators, on the next subsequent web page relating to the FOSC
     program, Lumber Liquidators shall prominently display the following information:
9
     •    That Lumber Liquidators is presently engaged in class action litigation
10   concerning the formaldehyde content of its Chinese-manufactured laminate
     flooring products.
11
     •    That Lumber Liquidators' statements in connection with its Chinese-
12   manufactured flooring and the Air Quality Test Kit program represent the positions
     of Lumber Liquidators, which may be contested by plaintiffs in the pending class
13   action litigation concerning these products.

14   •    That the interests of purchasers of these products in the pending class
     litigation are represented by class counsel.
15
     •     That the customer may learn more about these issues at a webpage
16   established by class counsel, whose URL, and a clickable link thereto, shall be
     provided on the page.
17
     •    [That by participating in the FOSC program, the air quality test results will
18   be shared by EDLabs with Lumber Liquidators, which may seek to use those
     results against the customer in the pending class litigation.]
19
     •    [That the FOSC test kit from EDLabs is available for a fee at various online
20   sellers, and that if the customer prefers to order the kit from one of these sellers, at
     his or her own expense, then the test results will not be shared automatically with
21   Lumber Liquidators.  Also, that more information can be obtained from
     www.indoorairtest.com or other online vendors.]
22
          If Lumber Liquidators seeks to modify the presentment of the FOSC or
23   other formaldehyde test kit program on its website, it shall notify counsel for
     plaintiff, or plaintiffs' lead counsel in any consolidated proceeding of which this
24   case becomes a part, at least fourteen (14) calendar days in advance. With respect
     to any such changes, Lumber Liquidators shall provide the notices required above
25   to any purchasers of Lumber Liquidators' Chinese-manufactured laminates who are
     qualified by Lumber Liquidators to order such test kits.
26

27   _____
     [2] The Silverthorn Plaintiffs explain that "bracketed text is subject to confirmation through
28   expedited discovery, and further subject to the Court's allowing Defendant to continue gathering
     this data from class members ex parte."  ECF No. 19-2 at 7, n. 2.

<u>Telephone or live communications with class members</u>. For each customer qualified to receive a test kit under Lumber Liquidators' FOSC program, Lumber Liquidators' personnel shall provide notice of the following to the customer before processing a test kit for such customer:

•       That Lumber Liquidators is presently engaged in class action litigation concerning the formaldehyde content of its Chinese-manufactured laminate flooring products.

•       That Lumber Liquidators' statements in connection with its Chinese-manufactured flooring and the Air Quality Test Kit program represent the positions of Lumber Liquidators, which may be contested by plaintiffs in the pending class action litigation concerning these products.

•       That the interests of purchasers of these products in the pending class litigation are represented by class counsel.

•       That the customer may learn more about these issues at a telephone number provided by plaintiff's counsel or lead plaintiffs' counsel in any consolidated proceeding of which this case becomes a part, which phone number will be provided to the customer.

•       [That by participating in the FOSC program, the air quality test results will be shared by EDLabs with Lumber Liquidators, which may seek to use those results against the customer in the pending class litigation.]

•       [That the FOSC test kits from EDLabs is available for a fee at various online sellers, and that if the customer prefers to order the kit from one of these sellers, at his or her own expense, then the test results will not be shared automatically with Lumber Liquidators. The Lumber Liquidators representative will provide the toll-free phone number and website address of at least one online vendor believed to have FOSC test kits available.]

## III.    ANALYSIS

This Court has previously acknowledged its obligation to act, in part, as a caretaker of these related cases while the JPML considers the motion to consolidate these cases with the dozens of other cases concerning similar allegations pending across the country.  One one hand, as the Court noted in response to Defendant's motions to stay the case pending the JPML decision, "a district judge should not automatically stay discovery, postpone rulings on pending motions, or generally suspend further rulings upon a parties' motion to the MDL Panel for transfer and consolidation."  <u>Balero</u> at ECF No. 32, 2 at 1-2 (quoting <u>Rivers v. Walt Disney Co.</u>, 980 F. Supp. 1358, 1360 (C.D. Cal. 1997)).  But it is also true that the purpose of consolidation and transfer under Section 1407 is "to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation costs, and save the time and effort of the parties, the attorneys, the

1   witnesses, and the courts."  Manual for Complex Litigation, Fourth, at 220 (2004).  "The

2   pendency of motions raising questions common to related actions can itself be an additional

3   justification for transfer."  Id. at 221.

4        In light of these considerations, the Court returns to the question of whether resolution of

5   these motions is appropriate at this time.  "It is well-settled that district courts have the inherent

6   power to stay proceedings."  JBR, Inc. v. Keurig Green Mountain, Inc., No. 2:14-CV-00677-KJM,

7   2014 WL 1767701, at *1 (E.D. Cal. May 2, 2014).  In deciding whether a stay is warranted while

8   a consolidation motion is pending, courts typically consider "(1) potential prejudice to the non-

9   moving party; (2) hardship and inequity to the moving party if the action is not stayed; and (3) the

10  judicial resources that would be saved by avoiding duplicative litigation if the cases are in fact

11  consolidated."  Rivers, 980 F. Supp. at 1360.

12       **A.**     **Prejudice to the Parties**

13       The Court previously denied Defendant's request for a stay because both the Silverthorn

14  and Washington Plaintiffs had framed their motions as urgent efforts to preserve the status quo

15  against prejudicial actions by Defendant.  Silverthorn at ECF No. 32, 1 ("the motion seeks to

16  preserve the rights of the parties pending resolution of the JPML proceeding"); Washington at

17  ECF No. 32, 1 ("Lumber and its testing contractor are sending letters to putative class members

18  designed to change the status-quo").  The Court concluded that it could not determine whether the

19  relief Plaintiffs requested "should issue now" until it had the opportunity to "read[] the parties'

20  briefs and conduct[] a hearing."  Silverthorn at ECF No. 34, 2.

21       Now, after a thorough review of the motions, but without expressing any views regarding

22  the merits of the relief sought therein, the Court concludes that the motions both request

23  substantial departures from the status quo.  The Washington Plaintiffs ask the Court to order

24  Defendant to refrain from representing its testing kits as effective and to recommend that

25  concerned customers "retain a qualified industrial hygienist, environmental scientist, or

26  toxicologist to perform proper testing."  Washington at ECF No. 11-1, 1.  The Silverthorn

27  Plaintiffs ask the Court to order Defendant to make substantial alterations to their communications

28  with class members, both on their website and in telephonic communications.  The Silverthorn

United States District Court
Northern District of California

1    Plaintiffs also request expedited discovery of a host of issues relating to the air testing kit program.

2         Granting Plaintiffs any of the relief they request would not preserve the status quo, but

3    would in fact fundamentally alter the landscape of the litigation.  In considering these motions, the

4    Court views the "status quo" as consisting not only of the relationship between Lumber

5    Liquidators and the putative class, or between counsel for the parties and that class, but also the

6    relationship between the various courts presiding over these cases nationwide and the procedural

7    posture of those cases.  Plaintiffs argue that this relief is urgent as it involves allegedly dangerous

8    emissions in the homes of the putative class members, but Plaintiffs have not articulated a harm

9    that would result from deferring the resolution of these motions until after the JPML decides the

10   consolidation and transfer motion.  The JPML will hear that motion in just two weeks.

11        Granting Plaintiff any of the requested relief at this time would result in prejudice to

12   Defendant and to absent Plaintiffs who have brought similar litigation.  Ordering the Defendant to

13   take action in the shadow of the JPML's consideration of the transfer motion could result in

14   prejudice to Defendant, should the case be transferred to a different court which chose to decide

15   the matter differently.   On the other hand, if a transferee court were to honor an order by this

16   Court resolving the merits of these motions, that would result in depriving plaintiffs not currently

17   before this Court of the opportunity to weigh in on issues central to the litigation.

18        **B.      Judicial Economy**

19        The issues raised in these motions are central to these two cases and the dozens of other

20   cases that may be consolidated with them by the JPML.  The parties dispute what level of

21   formaldehyde in the air is safe in the home setting.  The parties dispute whether different methods

22   of testing homes for formaldehyde are appropriate.  The parties dispute whether Defendant's

23   communications with potential class members are false or misleading.  Resolution of these

24   motions would require the Court to expend substantial resources in order to wade into the

25   "intricacies" of these cases, which may be ultimately transferred to another judge.  Rivers, 980 F.

26   Supp. at 1360.

27        Any order by the Court on the merits of these motions would also present a risk of

28   inconsistency between the actions of this court and other courts that are currently presiding over

similar litigation in other judicial districts.  An order on the merits could also be inconsistent with the ultimate resolution of these issues by the transferee court.  Even if this Court were to grant Plaintiffs the relief they seek, "there are no guarantees that an order by this Court would not later be vacated" by a transferee court, in which case "this Court's investment of time and resources would [] have been in vain."  <u>Rivers</u>, 980 F. Supp. at 1361.  Therefore, the interest of judicial economy would be furthered by deferring ruling on these motions until after the JPML has made its decision.

The Court concludes that resolution of these motions should be left to the transferee judge appointed by the JPML.[3]

<b>CONCLUSION</b>

The Court hereby stays the resolution of the pending motions until the JPML has ruled on the motion for consolidation and transfer.  In the event the motion for transfer is granted, these motions will be resolved by the transferee judge in whatever manner that judge deems appropriate.  In the event the motion for transfer is denied, the Court will advise the parties of how it intends to proceed.

IT IS SO ORDERED.

Dated:  May 14, 2015

_____
JON S. TIGAR
United States District Judge

---

[3] At the hearing conducted May 14, 2015, Lumber Liquidators did not dispute that at least some of the consumers who viewed the forum selection, choice of law, and arbitration provisions on Lumber Liquidators' website, <u>see</u> <u>supra</u> at 3, might believe that the language applied to potential claims in this litigation, even though Lumber Liquidators has clearly stated that it will not attempt to enforce those provisions here.  Lumber Liquidators acknowledged that the Court would therefore be within its authority to require that Lumber Liquidators send a corrective letter to putative class members who viewed the foregoing provisions, advising them that the provisions were not effective.  Notwithstanding this concession, the Court will not order the sending of such a communication at this time.  For the reasons already discussed in this order, a prospective transferee judge should be allowed make a comprehensive decision about the corrective communications, if any, Lumber Liquidators is required to send to its customers in these cases.